```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
WILLIAM HILL,                                             :

                    Petitioner,                           :   15 Civ. 1235 (GBD) (GWG)

        -v.-                                              :
                                                              REPORT AND RECOMMENDATION
HAROLD GRAHAM,                                            :
Superintendent, Auburn Correctional Facility,
                                                          :
                    Respondent.
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Petitioner William Hill, currently an inmate at the Auburn Correctional Facility, New York, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On January 21, 2010, a jury convicted Hill of Murder in the Second Degree, N.Y. Penal Law §125.25(3), and Robbery in the First Degree, N.Y. Penal Law § 160.15(1). On March 1, 2010, Hill was sentenced to an indeterminate term of 25 years to life imprisonment. Hill, who is proceeding pro se, argues that: (1) the trial court improperly admitted written and videotaped statements Hill made to police; (2) the trial court improperly admitted security video footage; and (3) that his sentence should be reduced in the interest of justice. For the reasons stated below, his petition should be denied.

I. BACKGROUND

   A. The Investigation

On May 2, 2006, Jacob Gerstle was discovered on the floor of his apartment building's elevator with his wallet and cell phone missing. (Gerstle: RA 758, 760-62).[1] Police were soon contacted and, as part of the ensuing investigation, they acquired video from security cameras

---

[1] "RA" refers to page numbers provided in the Answer and Appendix in Support of Answer Opposing Petition for a writ of Habeas Corpus, filed May 26, 2015 (Docket # 15).

located in Gerstle's apartment complex. (See Gonzalez: RA 776-81). In an effort to identify an individual seen on the security footage, police released both a shortened clip of the video and photo stills of the individual to the media. (Mooney: RA 109; Gonzalez: RA 800-01). On May 5, 2006, two anonymous callers contacted the police and identified the individual in the footage as William Hill. (Mooney: RA 176-78). That same day, Gerstle succumbed to his injuries resulting from the robbery and died. (See Coleman: RA 983).

Following the identification of William Hill, police spoke with Hill's friends and family, including his half-brother, Dennis Sheppard. (Mooney: RA 111-13, 123). When Detective Robert Mooney spoke with Sheppard, the two discovered that Mooney had previously worked with both Sheppard and Hill's mother, Caroline Hill. (Mooney: RA 214-15, 224). From 1991 to 1994, Caroline Hill had worked as a "Police administrative aid [sic]" with Detective Mooney at the 30th Precinct. (Mooney: RA 214-17). Although Detective Mooney informed Sheppard about this personal connection, he never promised that he would help Hill in any specific way because of the relationship. (Mooney: RA 224-25). Police eventually located and arrested Hill, and brought him to the precinct for questioning. (Mooney: RA 129-33). During his interrogation, Hill made incriminating statements concerning the Gerstle robbery. (Mooney: RA 157-59).

B. The Suppression Hearing

On March 22, 2007, Hill, represented by Kevin Canfield, appeared before Justice Charles J. Tejada for a pre-trial suppression hearing in which Hill asserted, inter alia, that his written and videotaped confessions were obtained in violation of his right to counsel. See RA 287, 297-98 (Oral Decision of Supreme Court, N.Y. County, dated April 10, 2007). Testimony was then heard from Detectives Colon, Gallucci, Giorgio, and Mooney concerning the arrest, transport,

and interrogation of Hill, as well as from Hill's half-brother, Dennis Sheppard. See RA 288-96. Hill did not testify at the hearing.

        1. Testimony of Detective Mooney

As the assigned detective for the Gerstle homicide, Detective Mooney was contacted on May 12, 2006, and informed of Hill's arrest and transportation to the "3-4 precinct." (Mooney: RA 129-32). Upon arriving at the precinct, Detective Mooney was told by Detective Inspector Giorgio that Hill had been taken into the precinct's interview room and had requested to "speak to the district attorney." (Mooney: RA 133-34). Detective Mooney, followed by his partner, Detective Stewart, entered the interview room and engaged in a "preliminary conversation" with Hill, instructing him, "at th[is] point not to say anything to anybody, to sit there and listen." (Mooney: RA 134). Detective Mooney testified that he then informed Hill "why he was there," but did not begin to question Hill. (Mooney: RA 134, 136-37). Detective Mooney and Stewart then exited the interview room, leaving Hill inside. (See Mooney: RA 139). At approximately 6:00 p.m., Detectives Mooney and Stewart returned to the interview room and read Hill his Miranda rights using a written Miranda form. (Mooney: RA 138-39). After verbally affirming his understanding of his Miranda rights and agreeing to answer questions, Hill signed the form. (Mooney: RA 141-43). At no point during this process did Hill request to speak to an attorney or "ask . . . any clarifying questions" concerning his Miranda rights. (Id.).

After Detective Mooney read Hill his Miranda rights and obtained his signature waiving his right to have an attorney present during questioning, Hill again requested to speak with the District Attorney. (Mooney: RA 142-44). Despite Detective Mooney's assurances that an assistant district attorney would come to the station "depending on the necessity of the case," Hill was not convinced. (Mooney: RA 145). To alleviate this concern and proceed with

questioning, Detective Mooney called Alfred Peterson, the assistant district attorney assigned to the Gerstle homicide investigation, and handed the phone to Hill. (See Mooney: RA 146). After an approximately thirty-second conversation between Peterson and Hill, Hill seemed "satisfied that . . . an assistant DA would come to the precinct and speak with him." (Id.). However, when Detective Mooney resumed questioning, Hill interrupted Mooney and stated that "he would be happy to tell [Mooney] exactly what happened . . . but he wanted to speak to his brother first." (Mooney: RA 147, 150). Although granting such a request was "completely unusual," Detective Mooney contacted Sheppard and requested that he come to the precinct. (Mooney: RA 151-53, 213).

At approximately 8:30 p.m., Sheppard, along with his wife and an unidentified woman, arrived at the precinct. (Mooney: RA 152-53). After a brief explanation of the circumstances, Detective Mooney and Detective Stewart escorted Sheppard and his wife to the precinct interview room, which still held Hill. (Mooney: RA 153-54). Detective Mooney testified that he never promised Sheppard anything to ensure his cooperation. (Mooney: RA 154-55). Upon entering the room, Sheppard and Hill had "a very emotional exchange" in which Sheppard told Hill "you should just tell them the truth, get this over with, go to jail, pay your dues, and when you come back out . . . we'll try to be a family again." (Mooney: RA 154). Sheppard also stated that "his mother would be happy if [Hill] would at least tell the truth." (Mooney: RA 155). After an approximately ten minute conversation between Hill and Sheppard, Sheppard left the precinct. (Mooney: RA 156, 219). Detective Mooney testified that only at this point did he begin speaking with Hill about the death of Jacob Gerstle. (Mooney: RA 157). After Detectives Mooney and Stewart talked to Hill about the robbery, Detective Mooney "memorialized what Mr. Hill was saying in a handwritten statement." (Mooney: RA 159). Hill was then shown this

statement, corrected some portions of the document, and signed and acknowledged the statement on each page.  (Mooney: RA 161-63).  Later that evening, at approximately 11:00 p.m., Hill was provided a second Miranda warning, on videotape, in which he again waived his right to have counsel present and agreed to make a taped statement for the police.  (Mooney: RA 165-66).

      2. Testimony of Dennis Sheppard

Hill's half-brother, Dennis Sheppard, also testified at the hearing.  Sheppard testified that in his initial contact with Detective Mooney on May 9, 2006, Mooney had asked him to help "make [Hill] turn himself in." (Sheppard: RA 227, 232).  Sheppard testified that he had informed Detective Mooney during this initial conversation "that [his] brother was asking for a lawyer." (Sheppard: RA 248-49).

On the night of May 12, 2006, Sheppard was again contacted by police concerning the Gerstle homicide.  (See Sheppard: RA 254).  Sheppard testified that a detective called him on the phone and stated "we need you to come down to make [Mr. Hill] cooperate with us . . . he's talking about that he wants to see a lawyer and he wants to speak to you." (Sheppard: RA 233-34).  Sheppard testified that he then drove to the precinct and was informed by Detective Mooney, "if you help me make William Hill give a confession then we will appoint him a lawyer and things will be all right." (Sheppard: RA 240).  Sheppard testified that he then told Detective Mooney, "well, he's asking me for a lawyer and I can't afford it," (Sheppard: RA 258), to which Detective Mooney responded, "everything [will] be fine with your brother," and "he [will] be appointed an attorney." (Sheppard: RA 259-60).  Sheppard then entered the interview room and "encouraged [Hill] to cooperate with the police . . . [a]nd . . . tell the truth." (Sheppard: RA 261).

      3. Other Testimony

5

Testimony was also received from Detective Candido Colon, who testified as to Hill's arrest. (Colon: RA 4-42). Detective Colon testified that he had only a "brief conversation" with Hill. (Colon: RA 12). Detective Christopher Gallucci also testified regarding the arrest and his interactions with Hill. (Gallucci: RA 42-64). Detective Investigator Gennaro Giorgio described Hill's arrival at the precinct and a conversation he had with Hill regarding his request to speak with an Assistant District Attorney. (Giorgio: RA 67-98). Detective Giorgio told Hill that "in order for him to speak to an assistant DA that the detectives would first question him and advise him of his Miranda rights." (Giorgio: RA 73). Detective Giorgio testified that he thought he asked Hill if "he knew what [his Miranda rights] were" and that Hill "acknowledged he did." Id. Detective Giorgio then described further conversations with Hill, none of which included Hill requesting an attorney. (Giorgio: RA 74-78).

### 4. The Court's Decision

Justice Tejada denied Hill's motion to suppress in its entirety, finding "[t]he defendant voluntarily made the statement[s] after being advised of his Miranda warnings and in addition up to this point . . . did not request an attorney." RA 294. Justice Tejada interpreted discrepancies between the witnesses in a manner unfavorable to Hill. See RA 288-90, 295-96. Specifically, he found "[a]t no point did Mr. Sheppard say that he wanted a lawyer for his brother during custodial interrogation nor did he state that his brother had asked him to request a lawyer for custodial interrogation"; rather, "[a]ny discussion that the defendant's brother had with the police that made mention [of] a lawyer was connected with assuring that the defendant receive a fair trial." RA 296, 298.

### C. State Court Trial Proceedings

Hill had two jury trials. The initial trial before Justice Tejada ended in a mistrial, with

6

the jury unable to reach a verdict on the Murder and Robbery charges. RA 1809 (Brief for Respondent, dated Aug. 7, 2013 ("Resp. App. Br.")). Hill had his second jury trial before Justice Bruce Allen. Id. At trial, and over defense objection, the prosecution offered into evidence the videotapes and photos developed from the apartment building footage. (Gonzalez: RA 778-88); RA 1780 (Brief for Defendant-Appellant, dated Dec. 21, 2012 ("Def. App. Br."). The foundation for the evidence was laid by Detective Michael Gonzalez, who had extracted the videotape from the system. (Gonzalez: RA 778-789). Defense counsel objected to the admission because Detective Gonzalez "[couldn't] say for sure . . . where it ha[d] been or who had possession of it in the last year or two." (Gonzalez: RA 787). The trial judge admitted the video evidence after Detective Gonzalez affirmed the video was "accurate as to [his] recollection going way back to when it was first copied." (Gonzalez: RA 788).

Hill was convicted of Murder in the Second Degree, N.Y. Penal Law § 125.25(3), and Robbery in the First Degree, N.Y. Penal Law § 160.15(1). RA 1689. He was sentenced to an aggregate term of twenty-five years to life imprisonment. RA 1722.

    D.  Appeal

In December 2012, Hill, through counsel, submitted his brief in support of the appeal of his conviction. RA 1725-1800. He argued that: (1) the written and videotaped statements made by Hill were obtained illegally, because prior to making the statements Hill had requested and was refused access to an attorney and because police had exploited a personal relationship with Hill's family to procure Hill's confession; (2) the building security video, obtained from the victim's apartment, was improperly admitted as it lacked a proper foundation or testimony establishing chain of custody; and (3) Hill's sentence of twenty-five years to life imprisonment should be reduced in the interest of justice. RA 1726-27.

The Appellate Division rejected Hill's appeal in its entirety. It found "no basis for disturbing the court's credibility determinations," concluding that "the [trial] court was entitled to selectively accept or reject portions of each witness's testimony." People v. Hill, 110 A.D.3d 410, 410-11 (1st Dep't 2013). Furthermore, the Court found no reason to reject the trial court's ruling on the admissibility of the surveillance video, and "no basis for reducing the sentence." Id. at 411.

On March 7, 2014, the New York Court of Appeals denied Hill's application for leave to appeal. People v. Hill, 22 N.Y.3d 1156 (2014).

E. Instant Motion

Hill filed his pro se petition on February 18, 2015. See Petition under 28 U.S.C. § 2254 for writ of Habeas Corpus by a person in State Custody, filed Feb. 18, 2015 (Docket # 2) ("Pet."), at 2. Hill asserts essentially the same three grounds he raised in his state appeal: (1) that the written and videotaped statements were obtained in violation of his right to counsel; (2) that the surveillance video footage was improperly introduced at trial; and (3) that the sentence of 25 years to life imprisonment should be reduced in the interest of justice. Id. at 3.

The respondent filed opposition papers on May 26, 2015. See Answer Opp. Writ; Memorandum of Law Opposing Petition for a Writ of Habeas Corpus, dated May 26, 2015 (Docket #16) ("Mem. Opp. Writ"). Hill filed a traverse. See Petitioner's Traverse, dated June 19, 2015 (Docket # 20) ("Traverse").

II. GOVERNING LAW

A. Legal Standard for Petitions Brought Pursuant to 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court unless the state court's adjudication:

8

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a claim will be considered "adjudicated on the merits" even if the state court fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citation omitted); see also id. at 98 (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S.

9

362, 405-06 (2000). Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been unreasonable — a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 562 U.S. at 102; accord id. ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.") (citation omitted). In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103; see also Woods v. Donald, 135 S. Ct. 1372, 1378 (2015) (an "extreme malfunction" by the state court in applying Supreme Court precedent is "required for federal habeas relief") (citation and internal quotation marks omitted).

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir. 2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Thus, "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." Woods, 135 S. Ct. at 1377

10

(internal punctuation and citation omitted); accord Brisco, 565 F.3d at 90 (a court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (citation and internal quotation marks omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision can be neither contrary to nor an unreasonable application of clearly established federal law, see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

B.  Exhaustion

"Before a federal court may grant habeas relief to a state prisoner," however, "the prisoner must exhaust his remedies in state court." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State.").

11

The Supreme Court has held that

> [b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan, 526 U.S. at 845; accord Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts. See, e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review.")) (internal quotation marks and citations omitted). The petitioner must also have fairly presented the "federal nature" of each claim to the state courts. Id.; Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam); Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005).

III. DISCUSSION

    A. Admissibility of the Statements

The Fifth Amendment provides that "no person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment "secures against state invasion [of] the same privilege that the Fifth Amendment guarantees against federal infringement." Missouri v. Seibert, 542 U.S. 600, 607 (2004). This right, however, may be waived as long as the waiver is made "voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Hill argues that the trial court was "unreasonable in it[]s factual findings that petitioner's statement was lawfully and voluntarily obtained," Pet. at 6, and that his Fifth, Sixth, and Fourteenth Amendment rights were violated by Detective Mooney's decision to continue the interrogation after Hill had made "several unequivocal requests for counsel directly and through

Mr. Sheppard." Traverse, at 5; see also Pet. at 6(a)-6(d).

Hill's argument is in essence a request to overturn the state court's factual findings. Such a request must be adjudicated based on the standard governing habeas corpus review of factual determinations. A state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); accord Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (a federal court sitting in habeas is to "presume the [state court's] factual findings to be sound unless [the petitioner] rebuts the 'presumption of correctness by clear and convincing evidence'") (quoting 28 U.S.C. § 2254(e)(1)); Miller-El v. Cockrell, 537 U.S. 322, 324 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."). "Where reasonable minds reviewing the record might disagree as to the relevant finding, that is not sufficient to supplant the state court's factual determination." Cardoza v. Rock, 731 F.3d 169, 178 (2d Cir. 2013) (citation, internal quotation marks, and brackets omitted). "Nevertheless, the state court's finding might represent an 'unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding." Id. (citing Wiggins v. Smith, 539 U.S. 510, 528 (2003)). An unreasonable determination of the facts might also be found "where the court ignored highly probative and material evidence." Id. (citing Cockrell, 537 U.S. at 346).

Hill has not met this exacting standard. None of the testifying detectives suggested that Hill ever made mention of a need for counsel prior to or during his interrogation and Detective

Mooney testified directly that Hill never made such a request. (Mooney: RA 220-21). Although Hill argues that he affirmatively charged Sheppard to request counsel on his behalf, Pet. at 6(b), and offers Sheppard's testimony to support this contention (Sheppard: RA 236-41), none of the testifying detectives suggested Sheppard ever requested counsel for Hill and Detective Mooney testified that this never occurred (Mooney: RA 264-66). Here, the trial court resolved inconsistencies between these competing witnesses by choosing to "accept or reject portions of each witness's testimony." Hill, 110 A.D.3d at 410-11. Its findings, although unfavorable to Hill, remain supported by the record and are thus "presumed correct." Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (internal quotation marks and citation omitted).

With regard to Sheppard's testimony that he made numerous references to Hill's need for an attorney, the trial court concluded that any "discussion that [Sheppard] had with the police that made mention [of] a lawyer was connected with assuring that the defendant receive a fair trial," RA 298, and rejected Hill's argument that Sheppard was in fact requesting counsel for Hill during the custodial interrogation. See RA 296.[2] It may be noted that, without Hill's direction, any request by Sheppard that Hill be given an attorney would be of no relevance inasmuch as it is well settled that the right to counsel "is personal to the individual questioned . . . [and] must be affirmatively invoked by the suspect." United States v. Medunjanin, 752 F.3d 576, 587 (2d Cir. 2014) (citing Davis v. United States 512 U.S. 452, 461 (1994)). It cannot be invoked on behalf of the defendant by another person "[a]bsent a showing that [the defendant] desired an attorney and directed [the third party] to obtain counsel for him." Terry v. Lefevre, 862 F.2d 409, 412

---

[2] Indeed, Hill concedes in his Traverse that Sheppard's testimony was "perhaps not conclusive [and that] . . . [a] rational fact-finder might discount it or, conceivably find it incredible." Traverse at 6.

(2d Cir. 1988).

Given that the trial court was entitled to make credibility determinations to resolve the conflicting evidence, Hill has not provided "clear and convincing evidence" that the trial court's finding regarding the voluntariness of his waiver of the right to counsel must be set aside.³

B. Admissibility of the Surveillance Video

Hill argues that "the trial court erred by admitting into evidence building security video where the prosecution failed to lay a proper foundation . . . [and] fail[ed] to establish chain of custody." Pet. at 8. Hill relies on no federal constitutional doctrine, however, in making this argument. Nor did his appellate brief in state court refer to any federal constitutional right or principle. RA 1780-92 (Pet. App. Br.).

Federal habeas corpus relief can be granted only where a state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. 2254(d)(1). Thus, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 63 (1991); see also Johnson v. Filion, 2005 WL 3086661, at *3 (S.D.N.Y. Nov. 18, 2005) ("Errors of state law are not subject to federal habeas review."). For this reason alone, Hill's claim that the video was improperly admitted must be denied because it does not raise a federal claim.

Even if we were to construe this claim as raising a federal claim of some kind, it would

---

³ Hill also asserts that the Sixth Amendment requires suppression of his written and videotaped confessions. Pet. at 6(d). The Sixth Amendment, however, affords a right to counsel that attaches only after "judicial process has been initiated." Montejo v. Louisiana, 556 U.S. 778, 786 (2009); accord Moran v. Burbine, 475 U.S. 412, 428 (1986) (stating the Sixth Amendment right to counsel attaches only "after the first formal charging proceeding."). Thus, it does not apply to the statements at issue here.

have to be denied for procedural reasons. As already noted, a federal habeas court may only consider a claim if it has been presented for all available levels in the state courts. See, e.g., Baldwin v. Reese, 541 U.S. at 29. Hill has not complied with this exhaustion requirement. There is no point in staying the petition to allow Hill to do so, however, because his claim is based on evidence in the trial court record and Hill has "already taken his one direct appeal"; thus the claim is now "procedurally barred from consideration in a collateral attack on his conviction" in light of N.Y. Crim. Proc. Law § 440.10(2)(c), which bars a state court from considering on collateral review a record-based claim that the defendant unjustifiably failed to raise on direct review. Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006). When a petitioner fails to present a claim to each level of the state courts and is thus foreclosed from doing so by a state procedural rule (that is, the rule permitting only one appeal), the petitioner's claim is "deemed exhausted" for purposes of federal habeas review. Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); accord Aparicio, 269 F.3d at 90 ("Petitioner was entitled to one (and only one) appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals."); Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994); Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991). In these circumstances, the claim is "procedurally defaulted" and may be raised now "only if the [petitioner] can first demonstrate either cause and actual prejudice, or that he is actually innocent." Clark v. Perez, 510 F.3d 382, 393 (2d Cir. 2008) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)); accord Jimenez, 458 F.3d at 149. No such showing has been made here.

    C. Claim of Unjust Sentence

Finally, Hill argues that his sentence "should be reduced . . . in the interest of justice." Pet. at 9. Although Hill does not explicitly invoke federal law, reading his claim broadly we

interpret it to assert that his sentence was excessive based on the crimes for which he was convicted. Respondent argues that Hill's claim is unexhausted because Hill did not raise it in federal constitutional terms in the state courts, and furthermore, omitted the claim from his application for leave to appeal. See Mem. Opp. Writ, at 48-49. Although it appears Respondent is correct, compare RA 1793-98 (Def. App. Br.) with RA 1915 (App. For Leave), it is unnecessary to reach the question of exhaustion because this claim, if brought as a claim under the Eighth Amendment, would nonetheless have to be denied on the merits. See 28 U.S.C. § 2254(b)(2) (permitting denial of a habeas corpus petition on the merits notwithstanding a failure to exhaust).

While the Eighth Amendment prohibits the imposition of a sentence that is "grossly disproportionate to the severity of the crime," Rummel v. Estelle, 445 U.S. 263, 271 (1980) (citations omitted), the Second Circuit has stated that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law," White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); accord Ross v. Conway, 2010 WL 5775092, at *18 (N.D.N.Y. Dec. 6, 2010); Willard v. New York, 2009 WL 4823365, at *6 (E.D.N.Y. Dec. 4, 2009) ("[a] sentence of imprisonment which is within the limits of a valid state statute is simply not cruel and unusual punishment in the constitutional sense") (citations omitted); Jackson v. Lacy, 74 F. Supp. 2d 173, 181 (N.D.N.Y. 1999) ("[i]t is well-settled . . . that a prisoner may not challenge the length of a sentence that does not exceed the maximum set by state law") (citation omitted). Here, Hill makes no argument that the sentence he received was outside the range permitted under the governing State statute.

To the extent that a habeas petitioner may challenge a lawful sentence under state law as being "grossly disproportionate to the crime," United States v. Snype, 441 F.3d 119, 152 (2d

Cir.) (citing cases) (internal quotation marks omitted), cert. denied, 549 U.S. 923 (2006); see Solem v. Helm, 463 U.S. 277, 288 (1983), no such challenge could succeed here.  This case is not one of the "rare instances" where a "'reviewing court . . . [is] required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.'"  Bethea v. Scully, 834 F.2d 257, 261 (2d Cir. 1987) (quoting United States v. Ortiz, 742 F.2d 712, 714 (2d Cir.), cert. denied, 469 U.S. 1075 (1984)) (additional citation omitted).  It is enough to say that a sentence of 25 years to life is plainly not grossly disproportionate to the crimes of murder and robbery.

IV.  CONCLUSION

For the foregoing reasons, the petition for habeas corpus should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Daniels.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: January 27, 2016
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

William Hill
DIN 10-A-1167
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13024

19